## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **NEIL W. WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 20-215-CG-MU** |
| | ) | |
| **OUTOKUMPU STAINLESS USA,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the court on Plaintiff's motion for partial summary judgment (Doc. 52), Defendant's motion for summary judgment (Doc. 54), the parties' responses and replies thereto (Docs. 59, 65, 66, 68), Plaintiff's motion to strike evidentiary material (Doc. 64), and Defendant's opposition to Plaintiff's motion to strike (Doc. 69). For the reasons explained below, the Court finds that summary judgment is due to be granted in favor of OTK on all of Plaintiff's claims.

## FACTS

Plaintiff filed this lawsuit asserting claims relating to his employment with and termination from Defendant Outokumpu Stainless USA, LLC (hereafter "OTK"). The complaint asserts claims for discrimination in violation of the Americans with Disabilities Act (ADA), interference with Plaintiff's rights under the Family Medical Leave Act (FMLA), and retaliation or discrimination against Plaintiff for his attempt to assert his FMLA rights. (Doc. 1).

1

Prior to starting his employment with OTK, Plaintiff was diagnosed with antiphospholipid syndrome ("APS") that causes his blood not to "thin itself" and can result in blood clots. (Doc. 50-8, PageID.497-99).  With APS, if Plaintiff regularly has his blood checked and a doctor adjusts his medication then his condition would likely be under control, but changes in his diet could throw it off. (Doc. 50-8, PageID.502-03).  Before he was hospitalized, Plaintiff was not having any regular medical treatment.  After he was hospitalized, he would get his blood checked sometimes, but there was still some irregularity. (Doc. 50-8, PageID.502-03). When his blood was too thin Plaintiff would have side effects such as passing blood, feeling lightheaded and weak, and having swelling and joint pain. (Doc. 56-1, PageID.636-37).  Plaintiff testified that APS did not prevent him from working in any capacity or from doing any other type of activities. (Doc. 56-1, PageID.633).

OTK manufactures stainless steel products at its mill in Calvert, Alabama. (Doc. 56-9, PageID.1009; Doc. 56-3, PageID.972).  Plaintiff began working at OTK as a fulltime maintenance mechanic at OTK's Calvert facility on June 5, 2017. (Doc. 50-8, PageID.493).  As a maintenance mechanic, Plaintiff worked on the HAPL production line, which required some specialized training and is a continuous 24-hour, 7 day a week operation. (Doc. 56-1, PageID.614, 618, 773; Doc. 56-9, PageID.1011). The job required on-site presence at OTK's facility to perform the job. (Doc. 56-1, PageID.615).  If Plaintiff was out, someone would have to be called in to cover the shift because the mechanics were needed to keep the line running. (Doc.

2

56-1, PageID.614-15).  Regular attendance was a critical component of Plaintiff's mechanic job. (Doc. 56-1, PageID.617).  Plaintiff testified that he worked four days on, three days off and every two weeks his schedule would alternate between days and nights. (Doc. 56-1, PageID.609; Doc. 50-3, PageID.370).  According to OTK's HR manager, Karrie Walker, the schedule is set a year in advance and provides for two days on, two days off, then three days on and then just the opposite the next week. (Doc. 50-3, PageID.370-71).  The regular schedule would result in 36 hours one week and 48 hours the next, which would result in 8 hours of overtime the second week. (*Id.*).  Plaintiff testified that he worked a lot of overtime. (Doc. 56-1, PageID.609-10).  When unexpected things happened and there were outages or breakdowns, there could be schedule changes. (Doc. 56-1, PageID.610).  If there was a schedule change and an employee was called in for a project or to fill in for someone the employee could not turn it down unless they had been given less than 36-hours' notice. (Doc. 50-3, PageID.371).  There were instances when Plaintiff called in a day in advance and informed OTK that he needed to miss work and OTK would take Plaintiff off the schedule. (Doc. 56-1, PageID.611).  Plaintiff was required to notify OTK in advance if he needed time off, whether it was for FMLA or for any other reason. (Doc. 56-1, PageID.625-26).

During the relevant time period, OTK had an attendance policy in place which provided the following:

> a. An occurrence, for which a Team Member is issued one (1) point,
> occurs when a Team Member misses more than two hours of his/her

3

normally scheduled shift.

b. A tardy arrival, early departure, or other shift interruption of two hours or less is considered a one-half occurrence and results in issuance of a half (.5) point.

c. An absence of up to three (3) consecutive calendar days due to the same illness or injury is counted as one occurrence, provided that the Team Member supplies a note from a health care provider on his or her first day back to work.

d. When a Team Member is going to be absent, he or she is required to provide notice two (2) hours prior to the scheduled shift start time, unless it is not reasonably possible to do so, but must provide notice as soon as possible thereafter.

e. Absences that are covered by FMLA, prior approved vacation, time off due to a workers' compensation-covered injury, or other time off approved as an accommodation under the ADAAA will not count as occurrences and will not result in issuance of attendance points.

f. Team Members are awarded two Members Choice days (personal days) per year to use in the manner that they wish.

g. For every ninety (90) days that a Team Member has no occurrences, his or her attendance occurrences/points will be reduced by one occurrence/point.

h. Team Members who accrue attendance points are subject to progressive corrective action: 3.5 points (verbal coaching), 4.5 points (written warning), and 5.5 points (final written warning). If a Team Member accrues more than 5.5 points, his or her employment is terminated.

(Doc. 56-2, PageID.851, 857-59; Doc. 56-8, PageID.991-94; Doc. 56-13, PageID.1135-1143). OTK's office manager or "Process Administrator," Joan Anderson, testified that the rules regarding points were the same back in May and June 2018 as they were later. (Doc. 50-6, PageID.453-54; Doc. 56-2, PageID.850-51). Anderson ran

reports on attendance and communicated with supervisors or management about such reports. (Doc. 56-2, PageID.852).  Plaintiff was aware during his employment that OTK had an attendance policy and knew that if he was late he got a point and if he missed a day he got a point, "anything was a point." (Doc. 56-1, PageID.626-28).  Plaintiff did not remember exactly how many he had to accumulate to be terminated but he understood that if he accrued a certain number of points he would be terminated. (Do. 56-1, PageID.628-29).

Plaintiff was hospitalized May 15-16, 2018, and May 25-30, 2018. (Doc. 48-2, PageID.186; Doc. 49-8; Doc. 49-9).  On May 23, 2018, OTK's office manager, Joan Anderson, emailed the HR manager, Karrie Walker, the Production Coordinator, Wendell Bedwell, and copied the Mechanical Coordinator who supervised Plaintiff, Lloyd Tyler Phillips to report the following:

> [Plaintiff] was sitting at 5.5 points and was out Monday making it 6.5 points. He worked Tuesday and he came in this morning but already had to leave sick.  His hire date is 6/5/17 so he isn't eligible for FMLA. Wendell will contact you about his termination. Let me know if either of you need any further information.

(Doc. 48-1, PageID.172-73).  That same day, Wendell Bedwell responded that she had "sent Neil home today and he is going back to his doctor and I have also told him HR would be in contact with him for the next steps that he will have to take." (*Id.* at PageID.172).  Walker then responded:

> He didn't have a Dr's note for 5/2 and 5/3? Has he ever brought in any Dr's notes or asked for any Leave of Absence? I understand that he doesn't qualify for FMLA but I just want to make sure.

5

(*Id.*).  Phillips replied: I have not received any Dr excuses, or have not been asked about excuse of absence. (*Id.*).

On May 29, Phillips emailed team leader William Ruck:

If [Plaintiff] comes in to work, "tell him to contact HR. He has to get released by company doctor at OHC before he can return to work. We cannot have him falling out at work on our watch. He has to be cleared first.

(Doc. 48-1, PageID.176).

An email dated May 29, 2018, from Walker to Bedwell and to India Earies states that Walker and Plaintiff had been "going back and forth between calls and texts" and that Plaintiff said he has been very sick and is in the hospital. (Doc. 48-1, PageID.177).  Walker stated in the email that she had left him a message and a text that "we needed documentation that he was hospitalized and that he has been under a Drs care, as well as the times he has been to the Dr. by June 7, if he is even to be considered for short term." (Doc. 48-1, PageID.177).  India Earies was OTK's "HR Generalist" who managed the FMLA process and oversaw FMLA paperwork until December 2018. (Doc. 50-7, PageID.479-80). Earies would make the decision whether to approve someone for FMLA leave once they turned the paperwork in. (Doc. 50-7, PageID.480).  Melissa Pledger took over administering FMLA in October 2018.[1] (Doc. 56-11, PageID.1054).  Plaintiff's supervisor, Phillips, was promoted to

---

[1] The Court notes there is some discrepancy as to exactly when Pledger took over, but whether it was October or December 2018 appears irrelevant here

Production Coordinator on May 16, 2018 and no longer supervised Plaintiff. (Doc 50-1, PageID.335-336).  According to Phillips, after May 2018 he had nothing to do with Plaintiff's employment and he did not remember Plainitff's termination. (Doc. 50-3, PageID.423).  Jody Waldorf became Plaintiff's direct supervisor after Phillips. (Doc. 56-1, PageID.600).

On June 6, 2018, Plaintiff was examined by a Certified Registered Nurse Practitioner for OTK who determined that Plaintiff could perform the essential functions of his job. (Doc. 48-5, PageID.197-200).  The exam included a check of Plaintiff's weight, blood pressure, pulse, vision, and overall physical health and appearance. The only abnormal finding was a note regarding Plaintiff's ankles that they showed "mild pitting edema RLL. no erythema or pain." (Doc. 48-5, PageID.199).

Also on June 6, 2018, Walker and Earies met with Plaintiff and Plaintiff brought in his supporting documentation to qualify for short-term disability. (Doc. 50-3, PageID.385-88).  In that meeting Walker told Plaintiff his hospitalization was shy of the year of employment he needed to qualify for FMLA. (Doc. 50-3, PageID.388, 391).  At the time of the meeting, Plaintiff was eligible for FMLA since he had been employed for 1 year and 1 day.  However, Plaintiff had been cleared to return to work and Walker did not give Plaintiff any FMLA paperwork at that time. (Doc. 50-3, PageID.389).  Although Walker knew Plaintiff had been hospitalized and had been seriously ill, she testified that she did not know at that point, or at any

other relevant time, that Plaintiff had been diagnosed with a blood disorder. (Doc. 50-3, PageID.389). Plaintiff was approved for short term disability from May 25, 2018, through June 7, 2018. (Doc. 48-6). Employees do not receive points for FMLA time or short-term disability time and Plaintiff did not receive points for the time he received short-term disability. (Doc. 50-3, PageID.388). Walker admitted that she could exercise discretion to not apply points and that she may have tried to help Plaintiff out and given him the option to take no pay and not receive a point for his May 21, 2018 absence. (Doc. 50-3, PageID.390). Anderson testified that if an employee called in ahead of time a shift manager would also have discretion to take the employee off the schedule before a point was given. (Doc. 50-6, PageID.452).

Also on June 6, 2018, an Attendance Coaching Report was issued for Plaintiff. (Doc. 48-4, PageID.194-95). The Report was signed by Plaintiff as well as Williams, Bedwell and Walker and stated that Plaintiff had a total of 5.5 occurrences. (*Id.* at PageID.194). The form Report shows the box for final written warning was checked and states that "[a]dditional occurrences will result in progressive coaching, up to and including, termination." (*Id.*) The form also states that the intent of the Report is to highlight and document the coaching efforts performed and it lists the different levels of coaching: a Verbal Warning when there are at least 3.5 occurrences, a Written Warning when there are at least 4.5 occurrences, a Final Written Warning when there are at least 5.5 occurrences and Termination when there are 6 or greater occurrences. (*Id.* at PageID.195). The form

also states the following:

> To do your best work, it is necessary to be present and on time daily. This is one of your most important responsibilities as an [OTK] Team Member. Regular attendance directly affects both the Company and your team's ability to meet business objectives and to operate efficiently. Being absent or late to work causes confusion and a change to schedules and plans. Excessive absenteeism reduces the quality and efficiency of our operations, and causes undue hardships and difficulties on others.

(*Id.* at PageID.194).

According to Plaintiff, when he was hired he did not ask for any assistance in the performance of his job duties because of his medical condition but he did tell Bedwell about his blood disorder about a month after he started his job at OTK. (Doc. 56-1, PageID.607-609).  Bedwell mentioned to Plaintiff that he had a blood condition and Plaintiff responded back that Plaintiff also had a blood condition and that it causes his blood not to thin itself. (Doc. 56-1, PageID.646-47).  Plaintiff never told Bedwell that he anticipated needing to miss work because of his medical condition. (Doc. 56-1, PageID.647).  Bedwell remembers having a conversation with Plaintiff about his blood disorder, he does not remember exactly when, but said it was after Plaintiff had missed a day and Plaintiff told him he had been in the hospital. (Doc. 50-4, PageID.411-413).  Bedwell testified that he told Plaintiff that "it's very serious and he should take it serious, and I referred him that he needed to go see HR to talk to them about FMLA or anything that he could do on his side to make sure that they knew about his condition." (*Id.*).  In Bedwell's declaration, he states that the conversation occurred after Plaintiff had been hospitalized in May

9

2018. (Doc.56-3, PageID.875).  Plaintiff testified that he also discussed it with his supervisor, Phillips, after he was hospitalized for the blood clot and he mentioned it to the other mechanic Plaintiff works with to let him know that if Plaintiff was injured while working with him and his blood was too thin, "it would be hard to stop." (Doc. 56-1, PageID.647-48).  According to Phillips, Plaintiff may have told him that he felt bad and was not coming in but that prior to Plaintiff's hospitalization in May, Plaintiff never told Phillips that he had a blood condition that prevented him from coming to work. (Doc. 56-6, PageID.9098).  Phillips reports that the only time Plaintiff told him about any sort of specific physical ailment before that time was when Plaintiff texted him on April 5, 2018, requesting a vacation day because he got some kind of shot in his eye and was having stomach issues.  Phillips did not receive any follow up information about Plaintiff's issue with his eye. (Doc. 56-6, PageID.908-09, 917-20).  Phillips told Plaintiff that he was covered and had 66 hours of vacation left. (Doc. 56-6, PageID.909, 920).  Texts between Phillips and Plaintiff show that on May 21, 2018, Plaintiff texted that he was having problems with his blood being too thin and he requested a "personal day." (Doc. 56-6, PageID.924).  Then on May 25, 2018, Plaintiff texted that he was at the emergency room and being given blood thinners because his legs were swollen, and he was going back into the hospital. (Doc. 56-6, PageID.925).  The HR manager, Karrie Walker, testified that although Plaintiff had received short-term disability Plaintiff never told her that he had a medical issue that was going to be ongoing. (Doc. 56-13,

PageID.1194-95).  Walker says she made it specifically clear to Plaintiff that if Plaintiff had health conditions, he needed to let her know and "keep in communication." (Doc. 56-13, PageID.1194).  According to Walker, Plaintiff never informed her of any medical problems or issues he had between June 2018 and August 2018 and during that period she did not receive any information from Plaintiff or anyone else that indicated that Plaintiff could not perform his job duties or needed to be absent from work. (Doc. 56-7, PageID.938-39).  The HR Generalist, India Earies, also reports that she never received information leading her to believe Plaintiff had an ADA-covered disability or that he had sought an accommodation that was denied. Earies gave Plaintiff information to apply for short-term disability for his hospitalization but did not hear any more from Plaintiff about any medical condition or any need for time off because of a medical condition. (Do. 56-4, PageID.890).

After Plaintiff's FMLA eligibility date, he continued to seek healthcare related to his blood condition.  On July 19, 2018, Plaintiff went to see his primary care physician whose notes indicate he "educated" Plaintiff on the relationship of tobacco use to blood clots, on healthy eating, and on the risks of blood thinners and when to go to the ER. (Doc. 49-7, PageID.283). The physician's notes also indicate he "[c]onsulted pharmacy to introduce him to coumadin clinic," "[w]ill increase coumadin to 10 mg as he states he is currently taking 5mg," "[w]ill repeat labs at his occupational work clinic next week and contact us with results." (*Id.*)  The notes

11

state that the plan is for Plaintiff to be on this for a year prior to trying doac and that Plaintiff will require lifetime anticoagulation. (*Id.*).  The notes indicate a follow up visit would be in 2 months and that labs will be repeated to confirm antiphospholipid syndrome at his next visit. (Id.). The Progress notes indicate the physician tried calling Plaintiff on July 26 & 27, 2018 to follow up on Plaintiff's dose increase but was unable to reach him. (*Id.* at PageID.284).

According to Plaintiff's medical records, on August 1, 2018, Plaintiff's daughter consulted with a pharmacist because she felt Plaintiff would benefit from an anticoagulant other than warfarin that does not require monitoring. (Doc. 49-7. PageID.288).  The pharmacist noted that "[b]ecause of [Plaintiff's] work schedule, the worsening leg pain/swelling could have been due to vascular insufficiency from walking around" and the pharmacist discussed various medications for treatment with doctors. (*Id.*).  On August 7, 2018, Plaintiff visited his physician for an INR check and the notes indicate the plan was to discontinue warfarin and begin taking 20mg Xarelto. (*Id.* at PageID.290).  The medical records indicate that on August 23, 2018, the Pharmacist spoke with Plaintiff's daughter again about his medications. (*Id.* at PageID.292).  On August 24, 2018, Plaintiff presented to the pharmacy for an INR check and the pharmacist noted that Plaintiff's INR was "uncontrolled." (*Id.* at PageID.293).  On August 30, 2018, Plaintiff did not show up for his appointment and the pharmacists left a message for Plaintiff's daughter. (*Id.* at PageID.295). Plaintiff also did not pick up his prescription because he did not want to pay the co-

pay. (*Id*.).  Plaintiff testified that he tried to be compliant with his doctor's recommendations but admits that if he did not have the money to pay a co-pay for a medication or for a follow-up appointment or INR check then he would not pick up the medication or go to the appointment. (Doc. 56-1, PageID.733-34).  On August 31, 2018, the pharmacist left another message for Plaintiff. (Doc. 49-7 at PageID.296). On September 28, 2018, Plaintiff came in for an INR check and more adjustments were made to Plaintiff's medications. (*Id*. at PageID.297). On October 4, 2018, Plaintiff presented for another INR check. (*Id*. at PageID.299).

An incident report by OTK shows that Plaintiff received 90-day perfect attendance awards on November 24, 2017, and February 23, 2018, which zeroed out Plaintiff's point balance at that time. On March 27, 2018 Plaintiff was docked one point for missing more than 2 hours. On March 18, 2018, Plaintiff was docked .5 points for missing less than 2 hours. On April 1, 2018, Plaintiff was docked 1 point for missing more than 2 hours. On April 5, 2018, Plaintiff was docked 1 point for missing more than 2 hours. On May 2, 2018, Plaintiff was docked 1 point for missing more than 2 hours. On May 3, 2018, Plaintiff was docked 1 point for missing more than 2 hours.  None of Plaintiff's absences or tardinesses up to this point were eligible for FMLA since Plaintiff had been employed with OTK for less than a year.  Plaintiff's balance at his one-year employment anniversary was 5.5 occurrences or points.  (Doc. 48-7. PageID.206).

On August 2, 2018, Plaintiff was awarded a 1-point reduction for 90 days of

13

perfect attendance, leaving a balance of 4.5 occurrences. (Doc. 48-7, PageID.206). On September 4, 2018, Plaintiff was docked one point for missing more than 2 hours. (Doc. 48-7, PageID.207). The September 4 absence resulted from a day Plaintiff had been called in to work because of a forced outage. (Doc. 56-1, PageID.649-650). Plaintiff had been given advanced notice of the extra workday and did not inform OTK at least two hours before that he was not going to come in that day. (Doc. 50-8, PageID.505-06; Doc. 56-1, PageID.758). Plaintiff reports that his blood was thin that day and he was not feeling well. (Doc. 50-8, PageID.506-07). Plaintiff was off the previous day ( September 3, 2018) but had worked seven days straight prior to then. (Doc. 48-9, PageID.227).

On September 16, 2018, Plaintiff was docked .5 points for being late. (Doc. 48-7, PageID.207). At this point Plaintiff had accumulated 6 points which under OTK's attendance policy made him subject to termination. (Doc. 48-7, PageID.206-07). Plaintiff claims he was only late one minute and that the night before he had not been feeling well. (Doc. 51-2, PageID.517-18). Plaintiff did not have a doctor's appointment on September 16, 2018. (Doc. 56-1, PageID.722). An attendance incident report for Plaintiff shows "Termination" on September 16, 2018, but Plaintiff was not informed that he was terminated, and he continued to work. (Doc. 48-7, PageID.207).

On September 19, 2018, Anderson emailed Phillips and Walker and copied Pledger, Waldorff, and Bedwell that Plaintiff was at 5.5 points as of September 4

14

and he was 1 minute late on September 16. (Doc. 48-10 PageID.229). According to

Anderson, Phillips had asked her to check on Plaintiff's points because "it was going

on for a while, from May to September." (Doc. 50-6, PageID.463). In the email,

Anderson stated that she had asked Pledger to pull a gate stamp to make certain he

was not stopped on his way to the time clock and his gate stamp was consistent

with being one minute late clocking in. (Doc. 48-10 PageID.229). Anderson included

copies of Plaintiff's work incident report and time stamp records and said she had

also checked with Pledger to see if he had applied for FMLA and he had not. (*Id*.).

Anderson then said: "This puts him at 6 points. Good looking out [Phillips]." (*Id*.).

The email asked Walker to "[p]lease do whatever paperwork is necessary for

termination and let me know if there is anything I need to do to help." (*Id*.).

Bedwell replied that "we will take care of this next week when I return." (*Id*. at

PageID.232). According to Anderson, it was policy for everyone there that if they

were one minute late, they were docked half a point. (Doc. 50-6, PageID.464).

Anderson explained that the reason she said "good job" to Phillips was because she

had probably missed it when she checked the point report, but it was not because

she was out to get Plaintiff, she did not know Plaintiff and had no reason to be out

to get him. (*Id*. at PageID.466). In her Declaration, Anderson stated that she had

been talking with Phillips about the status of his points and had not had a chance to

run the attendance reports yet, so she said, "good looking out" because it showed

her that Phillips, as a coordinator, was staying on top of Team Member attendance."

15

(Doc. 56-2, PageID.854).  Anderson avers that she did not intend the comment to mean that she was glad Plaintiff had reached six points. (*Id.*).  Anderson admitted that she knew about Plaintiff's hospitalization and may have known he had a medical issue but she had no idea what his medical issues were. (Doc. 50-6, PageID.464, 475).

Also on September 19, 2018, Plaintiff texted Walker to say he had a doctor's excuse for the day he was "forced in on the outage." (Doc.49-2, PageID.243). Plaintiff also texted that he wanted to find out about FMLA. (*Id.*).  Plaintiff said Bedwell had been telling him about it. (*Id.*).  Walker texted back that he needs to call Jane Hayes today regarding FMLA because Earies is out until Friday and "[p]lease let me know what she says or if you do not get a hold of her." (*Id.* at PageID.244).  On October 4, 2018,[2] Walker texted Plaintiff to tell him they had not received any paperwork from his doctor and that it was the last day to submit it. (*Id.* at PageID.245).  Plaintiff replied that he would bring the paperwork to her. (*Id.*).  Later that same day Walker texted Plaintiff that they did not have all of the pages and it was not signed by the doctor and gave him OTK's fax number so that he could get it in. (*Id.* at PageID.246).  Walker told Plaintiff he needed to get it in

---

[2] It is unclear from the document submitted when these texts occurred. The date the texts were copied is not apparent and these texts indicate only that they were received "yesterday". However, the FMLA paperwork submitted as evidence indicates it was faxed to OTK on October 4, 2018. (Doc. 49-7, PageID.306).  Since the texts talk about the paperwork being faxed in that day, the Court presumes that "yesterday" was October 4, 2018.

today or he will have "pointed out." (*Id*.).  Later that day, Plaintiff texted that he had faxed the papers, but Walker responded that it does not state that he needs to be off work and only states that he is on blood thinner, and he can go to treatment on his days off. (*Id*. at PageID.247-48).  The next day,[3] on October 5, 2018, Plaintiff texted a picture, which is hard to make out in the Court's copy, but appears to be a picture of a doctor's note from USA Physician's Group. The picture is partially cut off but has Plaintiff's name handwritten in and says "Please excuse from work on 9/4/18. He had an app". (*Id*. at PageID.248).  Plaintiff admits that he did not actually have a doctor's appointment on September 4, 2018. (Doc. 56-1, PageID.712).  Plaintiff also admits that he could get an "INR check" to evaluate his medication needs on days that he was off work. (Doc. 56-1, PageID.725).

A Certification of Health Care Provider for Employee's Serious Health Condition was filled out and signed on October 4. 2018. (Doc. 49-7, PageID.301-304). It states that Plaintiff's condition commenced in May of 2018 and will probably endure for his life. (*Id*. at PageID.302).  It also states that Plaintiff was hospitalized for the condition May 5 - 30, 2018, and that Plaintiff was also treated for the condition on July 21, 2018 and October 2, 2018. (*Id*.).  The Certification indicates Plaintiff will need to be evaluated or treated one to two times per week as needed for INR check. (*Id*. at PageID.302).  It also states that Plaintiff is able to perform his

---

[3] As explained in the previous footnote, the document submitted that shows the texts does not indicate when it was made. This text entry indicates it was sent "Today" which the Court presumes from the context is October 5, 2018.

job functions with his condition but that because he is on blood thinner caution should be used if he ever has bleeding or injury. (*Id*.).  It states that Plaintiff will not be incapacitated from his condition but will need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of his medical condition. (*Id*. at PageID.303)  It further states that the condition will not cause episodic flare-ups that would prevent him from performing his job function. (*Id*.). The notes indicate this "revised" paperwork was faxed to Karen Walker at OTK on October 4, 2018. (*Id*. at 306).

An email, dated October 3, 2018, from Walker to Bedwell, Joseph Waldorff and copying Anderson and Earies states:

> [Plaintiff] had his Dr. Fax me paperwork, which does not qualify. I was away from my desk and was unable to access his information, so I simply told him not to come in tonight. I will get everything together in the am but I do not see anything that he could bring me that would excuse his last .5. I'll update you all.

(Doc. 49-4, PageID.267).  Walker called Plaintiff on the phone to inform him that he was terminated on October 4, 2018. (Doc.56-1, PageID.741).  A "Team Member Status Change Form," signed by Walker on October 5, 2018, states that Plaintiff's status was "Involuntary Termination" effective October 4, 2018. (Doc. 49-6, PageID.275).  Walker testified that when an employee reaches 6 points, the points are reviewed, and she and Bedwell would discuss the termination and would ultimately be responsible for the decision. (Doc.56-13, PageID1142-44). Walker was not aware of anyone who had not been terminated that had reached 6 points. (*Id*. at

18

1142).

## DISCUSSION

### I. Motion to Strike

Plaintiff moves to strike eight declarations filed by OTK. The first objection is to the declarations of Joan Anderson (Doc. 56-2, 60-2). Plaintiff asserts that some of Anderson's averments are contradictory and should be stricken. A court can strike an affidavit that contains is "inherently inconsistent" with the affiant's prior sworn testimony. *Van T. Junkins & Assocs. v. U.S Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984). "[A] party cannot give clear answers to unambiguous questions in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir.1987) (internal quotations and citation omitted). However, "every discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence." *Lane v. Celotex Corp.*, 782 F.2d 1526, 1529–30 (11th Cir.1986). "The differences between an affidavit and deposition testimony must truly be contradictory and cannot be potentially attributed to issues of recall" and "the differences in testimony must be more than that which would go to the strength of the testimony that could be explored on cross-examination." *Sims v. MVM, Inc.*, 2011 WL 13134650, at *4 (N.D. Ga. Mar. 25, 2011), aff'd, 704 F.3d 1327 (11th Cir. 2013).

Plaintiff contends that Anderson's statement that she "is unaware of any

19

Team Member who reached six points that were not otherwise covered by vacation or some form of approved leave who were not terminated" is contradictory because Plaintiff himself was not terminated following an email on May 23, 2018, in which Anderson stated that Plaintiff had 6.5 points. Plaintiff also contends that similar declaratory statements by Phillips, Bedwell, and Walker should be struck because they received Anderson's email and were aware that Plaintiff had reached 6.5 points in May 2018 and that he was not terminated at that time. However, the content of the email was not sworn testimony. And the fact that Anderson testified to sending the email does not convert the substance of the email to sworn testimony. Moreover, the Court does not find this prior statement to be contradictory. Plaintiff was terminated after reaching 6 points, albeit at a later date. The declaratory statement does not specify that everyone that reached 6 points was fired immediately regardless of whether the points might later be removed. In fact, the declaratory statement specifies that she is talking about six points "that were not covered by some form of approved leave."  Some of the absences that caused plaintiff to reach that level at the time of the email were ultimately excused because Plaintiff was approved for short-term disability leave. Thus, Plaintiff did not actually reach six points until September 16, 2018. The Court finds these statements by Anderson and the similar statements made by Phillips, Bedwell, and Walker should not be stricken as contradictory.

Plaintiff next objects to statements by Anderson, Phillips, Bedwell, and

20

Walker declaring that a true and correct copy of the attendance policy that was in place in 2018 is attached to their declaration. The document provides details regarding OTK's policies about the issuing of points or "occurrences" for attendance violations. (Doc. 60-2, PageID.1554-56).  Plaintiff asserts that these statements are hearsay that should be barred by the Best Evidence Rule because the attachment is dated August 31, 2018 and is inaccurate as to claims prior to that date. The Best Evidence Rule provides that the original documents or their duplicates must be produced to prove the content of any writing, unless the originals are lost or destroyed or cannot be obtained by any available judicial process. FED. R. EVID. 1002, 1004.  The Best Evidence Rule applies to summary judgment motions because although evidence does not have to be in admissible form to be considered at the summary judgment stage, "[o]n motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005).  Plaintiff does not object to the authenticity of the attachment itself which is presumably an accurate duplicate of the document it purports to be. He objects to the fact that its date does not cover all of 2018. However, in the instant case the only attendance points that are at issue occurred in September 2018, after the date of the document. Plaintiff reportedly reached 6 points in September 2018 and was terminated in October 2018, after the document that was produced took effect. So, the attendance policy in place in September and October 2018 is the policy at issue for Plaintiff's termination. That

21

time period is covered by the document submitted by OTK.[4]  Additionally, Plaintiff's

summary judgment motion submits the same material information in their

statement of undisputed facts – that employees receive .5 occurrences if tardy less

than two hours and receive 1.0 occurrences if tardy or absent more than 2 hours, six

points equates with termination etc. (Doc. 53, PageID.536-537).  Plaintiff's

statement of undisputed facts states that "[h]ow OTK actually issues occurrences /

points over attendance issues may be the subject of some immaterial disputes, but

the material facts about it are undisputed." (Doc. 53, PageID.536).  In Plaintiff's

response to OTK's statement of facts regarding these policies Plaintiff points out

that the document relied upon is dated August 31, 2018 but admits that the stated

facts "coincide generally with the testimony of witnesses and the August 31, 2018

Team Member Handbook" except for the accuracy of the statement that 6 points

"automatically" results in termination. Accordingly, the Court finds that the Best

Evidence Rule does not require the Court to strike the declarants' statements

regarding OTK's attendance policy.

Plaintiff again raises the Best Evidence Rule with regard to statements by

Anderson about an attendance report that she ran or "pulled" that reflected that

Plaintiff had attained 6 attendance points.  However, the statements are not being

offered to attest to the substance of the document but to show how Anderson

---

[4] The Court notes that there is also testimony that the attendance rules in effect
back in May & June of 2018 were the same as they were later. (Doc. 50-6,
PageID.453-54).

became aware of Plaintiff's point status and how OTK proceeded to terminate Plaintiff. There is no real dispute regarding how many points Plaintiff had acquired at that time. While Plaintiff may disagree with whether the points, upon review, should have counted against Plaintiff, the testimony regarding the report only shows the process by which OTK became aware of Plaintiff's point status and how OTK responded. The statements about the report are not being offered for the truth of the information contained in the document but simply to show Anderson's act of obtaining a report and therefore does not violate the hearsay or Best Evidence Rule.

Plaintiff next objects to the following statement by Anderson:

> Although I do not have a specific recollection of the conversation, I do recall speaking with [Phillips] about [Plaintiff] being out of work and the status of his points. I had not had a chance to run the ADP attendance reports yet, so I noted, "Good looking out, [Phillips]." This was because it showed me that Mr. Phillips, as a coordinator, was staying on top of Team Member attendance.

(Doc. 56-2, PageID.854).  Plaintiff contends that the above statement directly contradicts her sworn deposition testimony where she stated that the reason she said good job to Phillips was:

> Probably because I missed it when I checked the point report. Somehow maybe I missed it and [Phillips] said "Hey you know I didn't see anything."

(Doc. 50-6, PageID.466). Neither of these statements are clear answers and reflect the declarant's admitted inability to remember precisely what had been said or done. The discrepancy between the two statements appears to be attributed to

23

issues of recall about an unimportant detail. Whether Anderson had not yet run the report or had run it but somehow not caught that Plaintiff had attained 6 points is immaterial. The Court finds it unnecessary to strike this statement by Anderson.

Lastly as to Anderson, Plaintiff objects to her statement that she was "not involved in the decision to terminate Mr. William's employment with [OTK] but was instead "simply responsible for providing the information contained in Attachment 4" which is a copy of the September 19, 2018 email, which included copies of a report of Plaintiff's point history and his time stamps, and informed Phillips, Walker, Pledger, Waldorff, and Bedwell that Plaintiff had attained 6 points. The email also asks Walker to "do whatever paperwork is necessary for termination and to let [Anderson] know if there is anything [she] need[s] to do to help." (Doc. 56-2, PageID.854, 869-70). Plaintiff asserts Anderson's statement that she was not involved contradicts the substance of the email in which she asked Walker to do the paperwork necessary for termination. Again, the substance of the email is not sworn testimony. Moreover, the Court finds it is not inherently contradictory but merely an explanation of her statement in the email. The declaratory statement attempts to makes clear that she was not responsible for the actual decision to terminate Plaintiff but was involved in the administrative process that occurs when an employee reaches the level of points where OTK's attendance policy calls for termination of the employee.

Plaintiff objects to statements by Bedwell in his declaration that he

24

understood from his conversations with Walker "that she had extreme difficulty in getting in touch with [Plaintiff] and even had to go so far as to send him a certified letter." (Doc. 56-3, PageID.875). However, the statement is not being offered for the truth of the matter asserted. Bedwell is reportedly one of the decisionmakers for Plaintiff's termination and what he understood is a material fact in this case. Accordingly, the Court finds the statement is not hearsay.

Plaintiff also objects to Bedwell's declaratory statement that his conversation with Plaintiff about his blood condition occurred "after Plaintiff had been hospitalized in May 2018." Plaintiff asserts that this is contrary to his prior testimony because Bedwell also testified that "I do not know when ... I don't recall ... I'm pretty certain" that Plaintiff went and applied for FMLA soon after their discussion about his blood condition. (Doc. 50-4, PageID.414). Plaintiff asserts that he did not apply for FMLA until September 19, 2018. As such, Plaintiff contends Bedwell's declaratory statement that the discussion occurred in May 2018 is contrary to his prior testimony. However, Bedwell's prior testimony is consistent with his declaration. Bedwell testified that he remembers having a conversation with Plaintiff about his blood disorder, he does not remember exactly when, but said it was after Plaintiff had missed a day and Plaintiff told him he had been in the hospital. (Doc. 50-4, PageID.411-413). Bedwell's testimony that he did not know but thought that Plaintiff applied for FMLA soon after does not contradict any statement he makes in his declaration.

Plaintiff objects to Walker's statements in her declaration regarding what Earies said during their meeting with Plaintiff on June 6, 2018. Walker states the following:

> Ms. Earies and I emphasized the importance of keeping in touch with us if [Plaintiff] was having medical issues and/or was absent from work. Ms Earies also explained the process of filing for short-term disability benefits.

(Doc. 56-7, PageID.937). Walker's testimony about what she herself said is clearly not hearsay. As to what Earies said about the disability process, it is undisputed that at the meeting Plaintiff was provided with information regarding how to file for short-term disability and that Plaintiff did in fact apply for and receive short-term disability. Plaintiff testified that "she give me a number to call, and told me to call" and "said something about temporary disability, and that I could get paid for a couple days." (Doc 260, PageID.699). The declaratory statement is unnecessary as substantially the same information is available from Plaintiff's own testimony. Accordingly, Plaintiff's motion to strike the statement is moot.

Plaintiff also claims Walker's statements in her declaration about Plaintiff's FMLA paperwork not being complete when he first filed them should be stricken because they violate the Best Evidence Rule. Walker states in her deposition that when Plaintiff brought the paperwork, "I learned that [Plaintiff's] paperwork was not complete, in that it did not state the medical condition at issue, was missing pages, and it was not signed by the physician, which was required." However, the Best Evidence Rule does not apply if the originals are lost or destroyed or cannot be

26

obtained by any available judicial process. Given that Plaintiff faxed in completed FMLA paperwork later that same day, it is likely the incomplete set was not retained.  Moreover, since Plaintiff did bring in the completed paperwork that same day, the substance of the incomplete paperwork is immaterial. The texts between Walker and Plaintiff already show that Walker told Plaintiff his paperwork was incomplete, and that he needed to get completed paperwork in that day, and that Plaintiff later faxed in completed paperwork. The Court finds the statements regarding Plaintiff's incomplete paperwork should not be stricken.

Plaintiff asserts that Earies' statements in her declaration concerning her training and her understandings about OTK's legal obligations should be stricken as irrelevant because they do not state that they occurred at the relevant time period.  However, the statements are just general statements that she had training and experience with FMLA and short-term disability.  Plaintiff would be free to cross-examine Earies on her background during any trial and the Court finds striking these statements to be pointless. Whether they are stricken or not will not change the outcome of the parties' summary judgment motion.

Plaintiff also moves to strike statements by Earies that she did not receive information leading her to believe that Plaintiff had an ADA-covered disability or that he had sought an accommodation. Plaintiff claims the statement contradicts her earlier testimony and is also objectionable because Earies does not purport to have any training on the ADA. However, the Court finds the statement is not

27

contradictory and there is no requirement that Earies be trained on the ADA before stating what she was aware of or what her understanding was.

Considering all the above, the Court finds that Plaintiff's motion to strike should be denied.

## II. Motion for Summary Judgment

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for

29

trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. Discrimination in Violation of the Americans with Disabilities Act

Count One of Plaintiff's complaint asserts a claim for discrimination in violation of the Americans with Disabilities Act ("ADA").   To establish a *prima facie* case of discrimination under the ADA using circumstantial evidence, Plaintiff must prove that:

> (1) [Plaintiff] is disabled; (2) he was a "qualified individual" at the relevant time, meaning he could perform the essential functions of the job in question with or without reasonable accommodations; and (3) he was discriminated against because of his disability.

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001) (citation omitted).  "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." *Id.*

30

(citing 42 U.S.C. § 12112(b)(5)(A) and 29 C.F.R. § 1630.9(a)).  "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job. *Id.* (citation omitted). "The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's essential functions." *Id.* at 1255-56 (citations omitted).  "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007) (citations and internal quotations omitted).

"The Eleventh Circuit has held that in addition to possessing the required skills necessary to perform the essential job functions, an employee must be able to demonstrate those skills by reporting to work on a regular basis, thereby making attendance an essential function of most jobs." *Russell v. City of Mobile*, 2013 WL 1567372, at *6 (S.D. Ala. Apr. 12, 2013), aff'd sub nom. *Russell v. City of Mobile Police Dep't*, 552 F. App'x 905 (11th Cir. 2014).  OTK contends that regular attendance was an essential function of Plaintiff's position. Whether a function is essential is determined on a case-by-case basis. *Holly*, 492 F.3d at 1257. "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* Courts also consider

the testimony of the plaintiff's supervisor. *Id.* at 1257-58. (citations omitted). "Also considered are factors such as the amount of time spent on the job performing the function and the consequences of not requiring the employee to perform the function." *Ivey v. First Quality Retail Serv.*, 490 F. App'x 281, 285 (11th Cir. 2012) (citation omitted).

"Prior accommodations do not make an accommodation reasonable." *Id.* (citations omitted). Thus, the fact that OTK allowed plaintiff to take off more time than required or allowed Plaintiff to accumulate more occurrences before terminating him does not mean OTK was required to continue to allow Plaintiff to take off whenever he could not come to work for medical reasons. "The ADA covers people who can perform the essential functions of their jobs presently or in the immediate future." *Id.* (citation omitted). "[A]n employer is not required to accommodate an employee in any manner in which that employee desires." *Id.* (citation omitted). Being present was undoubtedly an essential function of Plaintiff's job, but the question is whether it was essential that Plaintiff have regular consistent attendance. Where, as here the job must be performed on site and cannot be deferred until a later day, the Eleventh Circuit has found regular attendance is an essential function. As the Eleventh Circuit has stated:

> We previously have held that regular attendance is an essential function of a housekeeping aide job, noting that, "[u]nlike other jobs that can be performed off site or deferred until a later day, the tasks of a housekeeping aide by their very nature must be performed daily at a specific location." *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir.1994); *see also Davis v. Florida Power & Light Co.*, 205 F.3d 1301

> (11th Cir.2000). Similarly, unlike other jobs that can be performed
> without regard to a specific schedule, the tasks of Appellant's job as
> store area coordinator by their very nature must be performed daily at
> a specific time.

*Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1366 (11th Cir. 2000) (finding attendance was

an essential function of employee's job and that employee was not a qualified

individual with a disability due to her unpredictable tardiness).  Requiring OTK to

accommodate Plaintiff's unpredictable absences without advance notice would place

upon OTK "the burden of making last-minute provisions for [Plaintiff's] work to be

done by someone else." *Jackson v. Veterans Admin.*, 22 F.3d 277, 279 (11th Cir.

1994). "Such a requirement would place an undue hardship on [OTK] ." *Id.* (citation

omitted).  After considering Plaintiff's detailed attendance policy and the testimony

regarding the nature of Plaintiff's job, the Court concludes that regular attendance

is an essential function of Plaintiff's position. If Plaintiff is unable to regularly

attend or at least provide reasonable notice when he cannot attend, then he could

not perform the essential functions of his job.  Plaintiff never requested a

reasonable accommodation and still has not identified a reasonable accommodation

that would allow him to perform the essential functions of his job.  Additionally,

"where the employee fails to identify a reasonable accommodation, the employer has

no affirmative duty to engage in an 'interactive process' or to show undue hardship,"

*Bagwell v,. Morgan City Comm'n*, 676 Fed.Appx. 863, 867 (11th Cir. 2017) (citation

omitted), and cannot be held liable "merely for failing to engage in the interactive

process itself (regardless of whether a 'reasonable accommodation' could in reality

have been made for the employee)." *Spears v. Creel*, 607 Fed.Appx. 943, 948 (11th Cir. 2015) (citation omitted)).

Plaintiff argues that he was eligible for FMLA and that OTK was required to provide him intermittent leave under the FMLA.  Plaintiff contends that he was entitled to FMLA leave for the September 4, 2018 absence.  He appears to argue that OTK discriminated against him based on his disability by denying him FMLA for that day. He testified that his blood was thin that day and he was not feeling well. (Doc.50-8, PageID.506-07). The Certificate of Health Care Provider form signed by Plaintiff's doctor states that Plaintiff is able to perform his job functions with his condition and his condition will not cause episodic flare-ups that would prevent him from performing his job function. (Doc. 49-7, PageID.302-03).  It states that Plaintiff will need to attend follow-up treatment appointments or work part-time or on a reduced schedule, but Plaintiff admits he could have his doctor appointments and blood checks on his days off.  Plaintiff also admits he did not have a doctor appointment on September 4, 2018 and he has offered no reason why he could not comply with the notice requirements of OTK's attendance policy. Moreover, allegations related to FMLA are not cognizable under an ADA claim for failure to accommodate. *See e.g. Trevino v. United Parcel Service*, 2009 WL 3423039 at *12 (N.D. Tex. Oct. 23, 2009).  "The leave provisions of the FMLA are 'wholly distinct from the reasonable accommodation obligations of employers covered under the ADA.' " *Gilliard v. Georgia Dept. of Corrections*, 500 Fed.Appx. 860, 865 (11th

34

Cir. 2012) (citing 29 C.F.R. s 825.702(a)).  "FMLA is not a reasonable accommodation under the ADA; rather, it is a right enforceable under a separate statutory provision." *Trevino*, 2009 WL 3423039 at *12.

If, on the other hand, Plaintiff is able to provide regular attendance as indicated by his doctor on the Certificate of Health Care Provider form, then he is a qualified individual who was not discriminated against on the basis of his disability. If Plaintiff's health condition does not prevent him from being able to regularly attend and he failed to do so and failed to give advanced notice as required by OTK's attendance policy, then he should be held to the same consequences as other employees when he violated that attendance policy. The evidence indicates Plaintiff was terminated for reaching six points, which under OTK's policies, results in termination. In light of the above, the Court finds Plaintiff has not shown that OTK failed to provide a reasonable accommodation or that OTK terminated Plaintiff because of his disability. Accordingly, summary judgment is due to be granted in favor of OTK as to Plaintiff's ADA claim.

## C. Interference of the Family Medical Leave Act

Count Two of Plaintiff's complaint asserts a claim for interference of Plaintiff's rights under FMLA. Plaintiff claims that OTK failed to timely notify Plaintiff of his eligibility to take FMLA leave, failed to timely provide Plaintiff with FMLA paperwork, and that his termination interfered with his right to take leave under FMLA. (Doc. 1, PageID.6-7).  Plaintiff claims he made known to Defendant

his need to take intermittent medical leave at the instruction of his treating doctor to obtain treatment of his serious medical condition. (*Id.* at PageID.7).

The FMLA renders it "unlawful for an employer to interfere with, restrain or deny the exercise of or the attempt to exercise, any right provided [under its provisions]." 29 U.S.C. § 2615(a).  "[U]nlawful employer interference includes not only refusing to authorize FMLA leave, but also discouraging an employee from using such leave." *Diamond v. Hospice of Fla. Keys, Inc.*, 677 F. App'x 586, 592 (11th Cir. 2017) (quoting 29 C.F.R. § 825.220(b)).

To establish an interference claim, an employee must demonstrate two things by a preponderance of the evidence— (1) that he was entitled to a benefit under the FMLA, and (2) his employer denied him that benefit. *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010) (citation omitted).  A plaintiff claiming interference must also show he was prejudiced by the FMLA violation. *Diamond*, 611 F. App'x at 592 (citing *Evans v Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014)).  "[E]ven if the employer has "committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages." *Cleveland v. Jefferson Cty. Bd. of Educ.*, 2017 WL 1806826, at *11 (N.D. Ala. May 5, 2017) (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999)).

In the instant case, Plaintiff did not become eligible for FMLA until June 5, 2018.  On that date Plaintiff had accumulated 5.5 attendance points or occurrences. His point balance was reduced by one point on August 2, 2018, leaving a balance of

36

4.5 points. But then on September 4, 2018, Plaintiff incurred 1 point for missing a day without giving advanced notice and on September 16, 2018 Plaintiff incurred .5 points for being late, bringing his total to six. Plaintiff claims he was not feeling well on September 4 and that he had not been feeling well the night before September 16. He eventually provided a doctor's note saying he had a doctor's appointment on September 4, 2018, but Plaintiff admits he did not have an appointment. Moreover, a doctor's note saying he had an appointment, without more, does not entitle Plaintiff to FMLA and was not sufficient to have the point erased under OTK's attendance policy. *See Andrews v. CSX Transp., Inc.*, 737 F.Supp.2d 1342, 1351 (M.D. Fla. 2010) ("[A] doctor's note that fails to specify the medical reason for the employee's absence does not provide the employer with sufficient notice of a potentially FMLA 'qualifying reason.' "); *see also Dorris v. Walmart, Inc.*, 2021 WL 1165929 at *4 (N.D. Fla. Mar. 28, 2021) (" "[S]imply calling in 'sick', without more information, 'will not be considered sufficient notice to trigger an employer's obligations under the [FMLA].' " (citations omitted)). The doctor's note did not indicate it was for a qualifying serious health condition. Plaintiff did submit a Certification of Health Care Provider for Employee's Serious Health Condition to attempt to apply for FMLA, but as discussed above, that form did not indicate that Plaintiff could not perform the functions of his job. The form indicated that Plaintiff would need to have follow-up doctor's appointments and a reduced work schedule but that his condition would not cause episodic flare-ups that would

37

prevent him from performing his job functions. Plaintiff did not have an appointment on September 4 or 16 and has not shown that he could not have given the notice required by OTK's attendance policy.  Plaintiff has not shown that his September 4 absence was for a qualifying reason under FMLA.

Even if the September 4 absence could be attributed to a qualifying serious health condition, Plaintiff has not shown that OTK had notice that it was for a qualifying reason.  An employee must "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). "Calling in "sick" without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act." *Id.*; *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1386 (11th Cir. 2005) ("For example, [i]f you have brain cancer but just tell your employer that you have a headache, you have not given the notice that the [FMLA] requires." (citation omitted)).  OTK is not obligated to pick over Plaintiff's prior claim for short term disability to search for medical information to support a subsequent FMLA claim. *Walker v. United Parcel Serv., Inc.*, 2021 WL 1089872, *14-15 (S.D. Fla.  Mar. 22, 2021).

Even if Plaintiff could show that his absence on September 4, 2018, was for an FMLA qualifying reason and that OTK knew the absence was for a potentially FMLA qualifying reason, he still would not have been entitled to FMLA  because he failed to comply with OTK's notice requirements. "When the need for leave is not

38

foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.303. Plaintiff has not shown that he required emergency medical treatment on September 4 or 16, 2018, or that any other unusual circumstances made him unable to comply with OTK's notice requirements.  Accordingly, the Court finds that summary judgment is due to be granted in favor of OTK as to Plaintiff's FMLA interference claim.

**D. Retaliation for Plaintiff's attempt to assert FMLA rights**

Count Three of Plaintiff's complaint asserts that Defendant retaliated against him for attempting to assert his rights under the FMLA by terminating Plaintiff. (Doc. 1, PageID.8-9).  "To prove FMLA retaliation, an employee must show that his employer intentionally discriminated against him for exercising an FMLA right." *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008) (citations omitted).

Plaintiff asserts that there is direct evidence of discrimination. The standard for proving discrimination using direct evidence is as follows:

> The Eleventh Circuit defines direct evidence of discrimination as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.' " *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998)). Direct evidence is evidence that, if believed by the trier of fact, "establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d

1263, 1283 (11th Cir.2000) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998)); *see also Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir.1997); *Kilpatrick v. Tyson Foods, Inc.*, 268 Fed.Appx. 860, 861–62 (11th Cir.2008). Moreover, "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitute direct evidence of discrimination. *Rojas v. Florida*, 285 F.3d 1339, 1342 n. 2 (11th Cir.2002) (quoting *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir.1999) (citations and quotations omitted)); *see Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir.2004) (citing Burrell, 125 F.3d at 1393). Where the plaintiff is able to prove by direct evidence that the employer acted with a discriminatory motive, in order to prevail the employer must prove, by a preponderance of the evidence, that the same decision would have been reached even absent that motive. *See Haynes v. W.C. Caye & Co.*, 52 F.3d 928, 931 (11th Cir.1995); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875–76 (11th Cir.1985).

*Beatty*, 881 F. Supp. 2d at 1352. The quintessential example of direct evidence would be a memorandum from company management directing the termination of an employee because he is disabled or because he applied for FMLA. *See Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997). The Plaintiff contends there is direct evidence of discrimination because Phillips testified about how expensive it is for OTK when employees are absent frequently and because Anderson complimented Phillips for "good looking out" when he asked her to run an attendance report and discovered Plaintiff had pointed out. However, this evidence does not directly correlate with an intent to discriminate on the basis of Plaintiff's attempt to exercise his FMLA rights. The fact requires an extra step: it requires the factfinder to infer that Plaintiff's FMLA request, as opposed to his lack of

attendance, motivated the decision to terminate Plaintiff.

Absent direct evidence of retaliatory intent, courts apply the burdenshifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* at 1268. To establish a *prima facie* case of FMLA retaliation Plainitff must show the following:

(1) he engaged in statutorily protected activity,
(2) he suffered an adverse employment decision, and
(3) the decision was causally related to the protected activity.

*Martin*, 543 F.3rd at 1268 (citation omitted). It is clear that Plaintiff's attempt to exercise FMLA leave is statutorily protected and that he suffered an adverse employment decision when he was terminated. To state a claim for retaliation, "the plaintiff must have been eligible for the leave that [he] sought." *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1052 (11th Cir. 2020). In the instant case, Plaintiff had been employed for a year and had met the 1,250-hour work requirement and there is evidence that he had a serious medical condition for which he might be able to take FMLA leave. Plaintiff has not shown that he was eligible for FMLA for the September 4 or 16, 2018 occurrences. However, looking at the facts in the light most favorable to Plaintiff, the Court will presume that OTK was at least put on notice that Plaintiff intended to take FMLA leave in the near future for which he may be eligible. Cf. *Walker v. Elmore Cty. Bd. of Educ.*, 379 F.3d 1249, 1252–53 (11th Cir. 2004) (finding no *prima facie* case where the plaintiff was not eligible when the request was made and would not be eligible for leave when the requested leave was

41

to begin).  The Court finds there is also evidence that the decision was causally related to the protected activity since Plaintiff was terminated so soon after attempting to apply for FMLA. If an employer takes an adverse employment action against an employee shortly after becoming aware of the employee's protected expression, then the close temporal proximity between the two events is sufficient to meet the "but-for" causation requirement. *See Adams v. City of Montgomery*, 569 F. App'x 769, 773 (11th Cir. 2014);

"Once the employee sets forth a *prima facie* case, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the employment decision." *Todd v. Fayette Cty. Sch. Dist.*, 2021 WL 2149351, at *9 (11th Cir. May 27, 2021).  The employer's burden is exceedingly light." *Hamilton v. Montgomery Cty. Bd. of Educ.*, 122 F. Supp. 2d 1273, 1280 (M.D. Ala. 2000) (quoting *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994) (internal quotations omitted)).  "Because the employer's burden is one of production—not persuasion— the employer 'need not persuade the court that it was actually motivated by the proffered reason[ ].' " *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1205 (11th Cir. 2013) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)).  If the Defendant proffers a legitimate reason for the employment decisions, the burden then shifts back to the plaintiff, who must show that the employer's proffered reasons are pretextual, or merely a cover for discrimination. *Id.*  "At the pretext stage, in order to survive summary judgment, Plaintiff must provide

42

sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the employer's decision." *Miller v. Bed, Bath & Beyond, Inc.*, 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Plaintiff may do this "(1) by showing that the employer's legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, a discriminatory reason more likely motivated the decision." *Id.* (citations omitted). "This is done by pointing to 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could find them unworthy of credence.' " *Hamilton*, 122 F. Supp.2d at 1281 (quoting *Combs,* 106 F.3d at 1539).  The ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Here, OTK has proffered a legitimate non-retaliatory reason for terminating Plaintiff – he incurred 6 attendance points or occurrences which under OTK's attendance policy results in termination. Thus, the burden then shifts back to Plaintiff to show that OTK's proffered reasons are pretextual. Here it is undisputed that Plaintiff incurred 6 points under OTK's attendance policy and Plaintiff has not shown than any other similarly situated employees incurred 6 points and were not terminated. Temporal proximity alone is not sufficient to establish that an

43

employer's reason for taking an action is pretextual. *Simmons v. Alabama State Univ.*, 2021 WL 3861651, at *3 (M.D. Ala. Aug. 30, 2021) (citing *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1137 (11th Cir. 2020). The evidence mentioned above concerning Phillips' testimony about how absences affected the company and Anderson's compliment to Phillips for catching Plaintiff's attendance point status is also unavailing. Neither Phillips nor Anderson were the decisionmakers in this case. Phillips was no longer Plaintiff's direct supervisor and Anderson was merely the office manager who ran the attendance reports to determine when an employee had reached certain point levels. Anderson provided the information to Bedwell and Walker and informed them that Plaintiff had reached the level at which employees are terminated. It was up to Bedwell and Walker to review Plaintiff's point history and make the decision to terminate Plaintiff. Moreover, Phillips' testimony merely shows that OTK's attendance policy was important to the company, which supports OTK's contention that Plaintiff was fired because of his attendance policy violations. Similarly, Anderson's compliment to Phillips that "good looking out" also does not indicate that Plaintiff's termination was for anything other than what OTK claims – that he was terminated for violating the attendance policy. The Court finds that Plaintiff has not met his burden of showing that OTK's legitimate non-retaliatory reasons for terminating Plaintiff were pretextual.

**CONCLUSION**

For the reasons stated above, the Court finds that summary judgment should be granted in favor of Outokumpu Stainless USA, LLC.  Accordingly, Plaintiff's motion for partial summary judgment (Doc. 52), is **DENIED** and Defendant's motion for summary judgment (Doc. 54), is **GRANTED.**

**DONE** and **ORDERED** this 15th day of October, 2021.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE